**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| ELIZABETH KINSKEY and GRACE KINSKEY, individually and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. |
| v. | ) ) | JURY TRIAL DEMANDED |
| BARNES & NOBLE COLLEGE BOOKSELLERS, LLC; CENGAGE LEARNING, INC.; FOLLETT HIGHER EDUCATION GROUP, INC.; MCGRAW-HILL LLC; MCGRAW-HILL GLOBAL EDUCATION HOLDINGS, LLC; and PEARSON EDUCATION, INC., | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**CLASS ACTION COMPLAINT**

Elizabeth A. Fegan
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Ph: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

Lynn A. Ellenberger
FEGAN SCOTT, LLC
500 Grant St., Suite 2900
Pittsburgh, PA 15219
Ph: (412) 346.4104
Fax: (412) 785.2400
lynn@feganscott.com

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION .................................................................................................. 4

III.    PARTIES ............................................................................................................. 4

IV.     FACTS ................................................................................................................ 7

       A.  Historically, college students shopped for textbooks and course
          materials at brick-and-mortar and online retailers or resellers based on
          price.................................................................................................................. 7

       B.  Defendants agree to implement "Inclusive Access" to exclude
          competition based on price for Course Materials to college students. ...................... 10

       C.  Pursuant to their agreement, Defendant Publishers only sell Course
          Materials to Defendant Retailers. ................................................................ 12

V.      RELEVANT MARKET...................................................................................... 16

VI.     ANTITRUST INJURY ...................................................................................... 18

VII.    INTERSTATE COMMERCE ............................................................................ 18

VIII.   FRAUDULENT CONCEALMENT.................................................................. 19

IX.     CLASS ALLEGATIONS ................................................................................... 19

X.      CAUSES OF ACTION ...................................................................................... 22

XI.     CONCLUSION.................................................................................................. 29

Plaintiffs Elizabeth Kinskey and Grace Kinskey ("Plaintiffs"), by and through their attorneys, bring this action on behalf of themselves and all others similarly situated against the three dominant publishers of college and graduate school textbooks, Cengage Learning, Inc. ("Cengage"), McGraw Hill, LLC (f/k/a McGraw-Hill Global Education Holdings, LLC) (collectively, "McGraw"), and Pearson Education, Inc. ("Pearson," collectively, the "Publisher Defendants"), and against the two dominant operators of official on-campus bookstores, Barnes & Noble College Booksellers, LLC ("B&N") and Follett Higher Education Group, Inc. ("Follett," collectively with B&N, the "Retailer Defendants").

## I.    INTRODUCTION

1.    Until the last several years, it was an annual rite of passage for college students to start each semester comparing prices for textbooks and course materials to be purchased for the upcoming semester. The prices of new books and used books at the campus bookstore were compared with the prices for new and used books at off-campus bookstores and online at Amazon, Ebay, resale websites and local website marketplaces. Students even looked to friends for hand-me-downs and at the library to see how many copies of a book the school owned. Competition based on price among new and used book retailers for sales of course materials to college students thrived.

2.    Faced with this intense competition, the dominant publishers of college textbooks and dominant retail chains operating on-campus college bookstores conspired to monopolize the market for college textbooks and course materials by entering into agreements with universities that restricted the course materials students could buy.

3.    Called "Inclusive Access," the agreements require students to obtain their course materials from their official on-campus bookstore only in an online format and to which access is

cut off at the end of the semester.

4.      Because students are not permitted to buy these required course materials from any other source, Defendants foreclosed competition from new print textbooks, used print textbooks, and other online sources, and also from off-campus and online bookstores and sellers.

5.      Defendants' monopolization of the market for college course materials in Inclusive Access courses has allowed them to charge higher prices for those course materials with no legitimate justification, to the detriment of college and graduate students.

6.      Inclusive Access increases students' costs and eliminates their choices in order to increase the profits of textbook publishers and on-campus college bookstore retail chains. As one recent analysis found, "[p]hrases like 'inclusive access' may sound great for students. In reality, publishers reap the benefits while students have fewer options than ever to save money. These programs create a virtual monopoly, undercutting academic freedom and low-cost options."

7.      Inclusive Access is actually an exclusive agreement between the Publisher Defendants and Retailer Defendants to protect their prices and profits from competition. Instead of students being instructed to buy a specific textbook for a class, from any source and in any format, students in an Inclusive Access course are required to pay for electronic access to the textbook, at the designated price, from their own official on-campus bookstore.

8.      Without Inclusive Access, many students would purchase a used version of the textbook on the secondary market, and the Publisher Defendants would not receive any money from those sales.

9.      The Retailer Defendants, who run a majority of all official on-campus college bookstores in the United States, use Inclusive Access to require students to make the Inclusive Access textbook purchases from their own on-campus bookstore.

10.     Without Inclusive Access, students could buy print or electronic textbooks from competing sources, and the Retailer Defendants would not receive any money from those sales.

11.     The Publisher Defendants refuse to sell Inclusive Access materials to any retailers other than official on-campus bookstores. If off-campus and online retailers were allowed to sell Inclusive Access materials to students, that competition would reduce prices. This exclusionary policy prevents competition and keeps prices high.

12.     Students effectively have no other choice than to purchase Inclusive Access materials at the designated price from their official on-campus bookstore. Reading assignments, homework, and quizzes are part of the official Inclusive Access materials, making the right to opt-out of Inclusive Access illusory. In fact, many colleges allegedly require a student who opts out to show proof of purchasing the materials from another source – which would be generally impossible.

13.     Moreover, at many colleges using Inclusive Access, students in Inclusive Access courses are automatically signed up for the Inclusive Access materials and automatically charged for them on their tuition bills.

14.     There are no pro-competitive justification for Inclusive Access, which always works to the disadvantage of students. Students pay higher prices, are forced to purchase electronic materials even if they prefer print, and they receive access to online materials with an expiration date as opposed to being able to save course materials for future reference or resell them at the end of the semester.

15.     Defendants' actions violate Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26). As a result of those actions, Plaintiffs have been overcharged, and seek treble damages and injunctive relief on

behalf of themselves and all others similarly situated.

## II.    JURISDICTION

16.    Plaintiffs bring claims under Sections 1 and 2 of the Sherman Antitrust Act, 15

U.S.C. §§ 1, 2, seeking treble damages pursuant to Section 4 of the Clayton Antitrust Act, 15

U.S.C. § 15, and injunctive relief pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C.

§ 26. This Court has subject matter jurisdiction over the Plaintiff's claims pursuant to 28 U.S.C.

§§ 1331 and 1337(a).

17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), as a

substantial part of the events giving rise to the claims herein occurred in this District, and in the

alternative, under 28 U.S.C. § 1391(b)(3), as this court would have personal jurisdiction over

Follett, who is an inhabitant of, and transacts business in, this District.

18.    This Court has personal jurisdiction over each Defendant on several grounds: (1)

Defendant Follett has its principal place of business in Illinois; (2) Defendants Cengage,

McGraw, and Pearson all transact substantial business in Illinois, including by selling course

materials to students at colleges in Illinois; (3) Defendants B&N and Follett transacted

substantial business in Illinois, including at campus bookstores operated by them; and (4)

Defendants committed acts in furtherance of the conspiracy in Illinois, including establishing

Inclusive Access programs at Illinois colleges and universities.

## III.    PARTIES

19.    Plaintiff Elizabeth Kinskey is a citizen and resident of Winnetka, Illinois.

Plaintiff attends Duquesne University in Pittsburgh, Pennsylvania.  On or about January 15,

2019, she was required to purchase and did purchase college textbooks and course materials

through Inclusive Access directly from McGraw-Hill Global Education Holdings, LLC.  On or

about January 27, 2020, she was required to purchase and did purchase college textbooks and

course materials through Inclusive Access directly from McGraw Hill LLC. As a result of the actions alleged herein, Plaintiff was overcharged for these purchases.

20.    Plaintiff Grace Kinskey is a resident of a citizen and resident of Winnetka, Illinois.  Plaintiff attends Marquette University in Milwaukee, Wisconsin.  To fulfill her course requirements at Marquette, she took courses at Illinois Central College during summers. In 2016, she was required to purchase certain course materials which were only available online, directly from Pearson.  As a result of the actions alleged herein, Plaintiff was overcharged for these purchases.

21.    Defendant Barnes & Noble College Booksellers, LLC is a Delaware limited liability company based in Basking Ridge, New Jersey that operates Barnes & Noble's campus bookstores on 773 campuses nationwide (as of April 12, 2020), including in Illinois at Concordia University Chicago, Columbia College Chicago, Illinois Institute of Technology, IIT College – Kent College of Law, Illinois State University, Northwestern University, Southwestern Illinois College, and University of Chicago. Barnes & Noble College Booksellers, LLC also operates the bookstore at Duquesne University where Plaintiff Elizabeth Kinskey attends school. Barnes & Noble College Booksellers, LLC sells Inclusive Access materials through those bookstores, among hundreds of others. Barnes & Noble College Booksellers, LLC maintains a registered agent in Illinois:  Capitol Corporate Serv. Inc., 1315 W. Lawrence Ave. Springfield, Illinois 62704.

22.    Defendant Follett Higher Education Group, Inc. is an Illinois corporation based in Westchester, Illinois that operates Follett's 1,200+ campus bookstores nationwide (as of April 12, 2020), including at the following colleges in Illinois: Carl Sandburg College, Chicago State University, College of DuPage, Governors State University, Knox College, Lewis University,

Loyola University – Chicago, Northern Illinois University, and Southern Illinois University. Follett Higher Education Group, Inc. sells Inclusive Access materials through those bookstores, among the hundreds of others. Follett maintains a registered agent in Illinois: CT Corporation System, 208 S. Lasalle St., Suite 814, Chicago, Illinois 60604.

23. Defendant Cengage Learning, Inc. is a Delaware corporation based in Boston, Massachusetts that publishes college textbooks and course materials, including through Inclusive Access. Cengage sells textbooks and course materials to citizens and residents attending colleges and universities in Illinois, among other states. Cengage maintains offices in Illinois, including at 1 N. State St., Suite 900, Chicago, IL 60602-3308, and a registered agent in Illinois: Prentice Hall Corporation, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

24. Defendant McGraw-Hill Global Education Holdings, LLC is a limited liability company based in New York, New York that published college textbooks and course materials, including through Inclusive Access. McGraw-Hill Global Education Holdings, LLC sold textbooks and course materials to citizens and residents attending colleges and universities in Illinois, among other states. McGraw-Hill Global Education Holdings, LLC maintained offices in Chicago, Illinois and maintains a registered agent in Illinois: Cogency Global Inc., 600 South Second St., Suite 404, Springfield, Illinois 62704. McGraw-Hill Global Education Holdings, LLC is now known as McGraw-Hill LLC.

25. Defendant McGraw-Hill LLC (f/k/a McGraw-Hill Global Education Holdings, LLC) is a Delaware limited liability company with its principal place of business in New York, New York that publishes and sells college textbooks and course materials, including through Inclusive Access. McGraw-Hill LLC sells textbooks and course materials to citizens and residents attending colleges and universities in Illinois, among other states. McGraw-Hill LLC

maintains an office in Chicago, Illinois and a registered agent in Illinois: Cogency Global Inc.,

600 South Second St., Suite 404, Springfield, Illinois 62704.

26.     Defendant Pearson Education, Inc. is a Delaware corporation based in Upper

Saddle River, New Jersey that publishes college textbooks and course materials, including

through Inclusive Access. Pearson sells textbooks and course materials to citizens and residents

attending colleges and universities in Illinois, among other states.  Pearson maintains offices in

Winnetka, Illinois and maintains a registered agent in Illinois: CT Corporation System, 208 S.

Lasalle St., Suite 814, Chicago, Illinois 60604.

## IV.     FACTS

### A.  Historically, college students shopped for textbooks and course materials at brick-and-mortar and online retailers or resellers based on price.

27.     Higher education course materials consist of traditional printed textbooks and other

materials, as well as digital textbooks and e-textbooks, which have been used as an alternative to

traditional, hard copy materials. Students historically obtain e-textbooks by purchasing access

codes (or unique serial numbers) that are used to unlock digital textbooks ("Course Materials").

These Course Materials sometimes also include homework, assignments, quizzes, tests, and/or

other learning software online.

28.     In December 2019, the Association of American Publishers estimated the reported

annual revenue for higher education Course Materials in the United States to be nearly $3 billion.

29.     The market for the materials for each course is captive; although students are the

Course Materials' end consumers, the  Universities (and their faculty) select which Course

Materials the students must purchase.

30.     The Publisher Defendants manufacture and sell and/or rent Course Materials and

control at least 80%, and reportedly closer to 90%, of the relevant market (or all relevant markets

in which the publishers sell Course Materials) nationwide. They have been the dominant firms in the market for the last 30 years.

31.     Thus, the Publishers market Course Materials to colleges and universities, not their students, and the Publishers generally do not market the Course Materials on price or other aspects important to students. In a properly functioning market, the Publishers would compete with each other to publish Course Materials for each University's classes and that competition would include the type, content, quality, service, and price of Course Materials.

32.     The Publishers have always made available for sale and sold Course Materials to both Defendant Retailers and other retailers. The Defendant Retailers contract with the Universities for an "on-campus" location that sells and rents Course Materials. Independent retailers, which include both brick-and-mortar locations as well as online sellers and platforms, compete with the Defendant Retailers to sell and rent Course Materials to students.

33.     For colleges and universities that lease or subcontract their collegiate retail operations (rather than having them run by the institution itself), each such school has one lease-operated collegiate retailer, which has generally paid the school for the right to operate the on-campus store. The Defendant Retailers operate over 50% of the on-campus stores nationwide, and they normally compete with each other to operate each school's on-campus store.

34.     Historically, the retailers engaged in full and open competition for student purchases of higher education Course Materials. Schools and faculty members selected Course Materials; publishers made available and sold such Course Materials to *all* retailers at the same price; and the students searched for competitive pricing and terms on those Course Materials—ultimately making purchases either from the Defendant Retailers, independent retailers, or other resellers of the materials.

8

35.     Competition between retailers acted as a check on the captive Course Materials market—multiple opportunities existed for students to seek lower prices and preferred sales terms, such as on Amazon or Ebay.

36.     Course Materials are identified and described in the market by an assigned International Standard Book Number ("ISBN"), a unique, numeric book identifier. Retailers (generally direct purchasers of the Course Materials from the publishers) and consumers (generally students) use the ISBN to locate the Course Materials for purchase or sale. Particularly since the early 2000s, when the sale of Course Materials online became more prevalent, students began using ISBNs to find Course Materials and locate the most competitive pricing. Publishers purchase ISBNs from an affiliate of the International ISBN Agency and assign them to Course Materials. Historically, a new ISBN is only assigned to each separate edition of a publication. Thus, if a publication with a certain ISBN was previously released (i.e., is not a brand-new publication), it can be identified and purchased, sold, or rented on the secondary market, without requiring a new purchase from a Publisher.

37.     Prior to the conspiracy alleged herein, student spending on textbooks from the Publishers had declined considerably as students had access to many alternatives to the purchase of new print or electronic textbooks from official on-campus stores, including used textbooks or purchasing from alternative retail options such as off-campus bookstores or online bookstores or sellers.

38.     From 1997 to 2007, university bookstores reportedly sold used books at an average of just under 75% of the new textbook price due to contract constraints requiring used book pricing to be no higher than 75% of the new book price.

39.     A 2015 study found that used textbook prices on sites like Amazon.com averaged

30% of the price of new textbooks. One study found that this more open competition, while decreasing prices for students, had also decreased the profits of the Publisher Defendants, which increased the Publisher Defendants' incentive to try to marginalize or eliminate the secondary market.

40.     As the sale of Course Materials (over the Internet, by Amazon, and through rentals) increased competition, lowered prices, and increased the availability of Course Materials, the Publisher Defendants looked for ways to reduce or eliminate competition and increase their revenues.  As an example, the Publisher Defendants moved to custom packaging and/or custom delivery of Course Materials with one-time digital access codes, "custom books" (i.e., offering the same book with minimal alterations as an entirely new product), or other offerings that created a unique International Standard Book Number ("ISBN") and hindered or made it impossible to acquire the Course Materials in a used or second-hand format.

41.     But even for these "new" Course Materials without a secondary market, independent bookstores could still obtain access to the Course Materials from the Publishers at the same cost as other retailers, and thus adapted and continued to offer lower prices, preferred sales terms, or rental selections, remaining competitive and maintaining choices for students in the Course Materials market.

### B. Defendants agree to implement "Inclusive Access" to exclude competition based on price for Course Materials to college students.

42.     In 2016, the Publisher Defendants formed Educational Publishers Enforcement Group ("Enforcement Group"). The supposed purpose of the Enforcement Group was to work against textbook counterfeiting.

43.     The Enforcement Group created what it alleged were anti-counterfeiting practices called the EPEG Guidelines, but those EPEG Guidelines in fact serve to limit which retailers are

allowed to sell textbooks in order to limit supply to enable the Publishers to have a captive market and charge higher prices. The Enforcement Group created a "white list" of acceptable retailers, and encouraged its members to refuse to sell to anyone not on the white list as a means of reducing competition from off-campus and online sellers, despite the fact that the vast majority of those sellers were simply selling used textbooks and were not engaged in counterfeiting.

44. In fact, the Enforcement Group has facilitated communication among the Publishers to implement a new program called "Inclusive Access" and enforce its terms.

45. In response to the decrease in their profits caused by the competition described above, the Publishers created and implemented the Inclusive Access system to exclude competition and raise prices.

46. Under Inclusive Access, students receive access to the online version of the textbook, the access expires after the semester is over, and the cost is often billed directly to a student's tuition bill. This can be arranged only through the official campus bookstore, whether run by a Retailer Defendant or directly by the college. Students are normally unable to purchase the Inclusive Access materials from any other source, because the Publisher Defendants refuse to sell them to off-campus bookstores or online bookstores.

47. Students are effectively required to purchase the Inclusive Access materials in order to obtain necessary materials to pass the course.

48. Students are often automatically subscribed to Inclusive Access materials and are automatically billed for them on their tuition bills.

49. While students technically have the legal right to opt-out of purchasing Inclusive Access materials, those materials are not available from other sources, and so a student who opts out of purchasing them would not be able to do necessary reading assignments and homework

11

problems. In some cases, a student who opts out is required to certify that they will purchase the Inclusive Access materials elsewhere, even though they are usually not available from other sources.

50.     The effect of Inclusive Access is to exclude any competition for course material purchases by eliminating the secondary market and eliminating other sources for students to purchase the Inclusive Access textbooks – students' only option is mandated purchases of Inclusive Access materials from the Publisher Defendants and (at the majority of campuses where Retailer Defendants operate the official on-campus bookstore) the Retailer Defendants.

51.     Defendants' Inclusive Access scheme has allowed them to arrest the decline in profits resulting from these trends of declining student spending on textbooks and stagnant new textbook prices that resulted from increased competition, and instead allowed them to preserve and increase their profits in the growing Inclusive Access sector by monopolizing the market or markets for Inclusive Access textbooks and charging supracompetitive prices for those textbooks.

52.     The Enforcement Group thus functions to allow the Publisher Defendants to communicate with one another in order to collude in imposing Inclusive Access, and to impose pretextual anti-counterfeiting policies that actually serve to restrict competition for textbooks. All three Publisher Defendants are members of the Enforcement Group and have been part of it since its inception.

### C. Pursuant to their agreement, Defendant Publishers only sell Course Materials to Defendant Retailers.

53.     On many campuses where the official on-campus bookstore is run by a Retailer Defendant, Inclusive Access is an exclusive arrangement between the Publisher Defendants, the Retailer Defendant, and the university. These arrangements are set forth in license agreements between each Publisher Defendant, the Retailer Defendant, and the university that the Publisher

Defendant will only sell Inclusive Access materials at that university through the Retailer Defendant that operates the official on-campus bookstore. These license agreements are nearly identical to one another, further evidence of collusion between Defendants to impose the Inclusive Access program.

54.     There are also direct exclusivity agreements between each Publisher Defendant and each Retailer Defendant, which are operative when there is not a license agreement involving a university where the Retailer Defendant operates. Per this agreement, the Publisher Defendant will not sell Inclusive Access materials to retailers other than the Retailer Defendant on the campuses where it operates. This allows for even more rapid expansion of the Inclusive Access system, since it doesn't require a formal license agreement to be executed with each university.

55.     When retailers other than the Retailer Defendants or on-campus bookstores run by universities have approached the Publisher Defendants and asked to purchase Inclusive Access materials to sell to students, they were refused. The Publisher Defendants either stated that they had an exclusive arrangement with the Retailer Defendant or college-run on-campus store, or that the Inclusive Access materials could not be made available in a format that would allow those off-campus or online retailers to resell them.

56.     In the few instances where the Publisher Defendants did sell Inclusive Access materials to off-campus retailers, often only after legal intervention, the materials were sold at a substantially higher price than they were sold to the Retailer Defendants or to college-run on-campus bookstores. This resulted in the off-campus retailers being unable to sell the materials at a competitive price and unable to compete with the Retailer Defendants or college-run on-campus bookstores for sales.

57.     The Publisher Defendants and Retailer Defendants claim that Inclusive Access has technological advantages, but in reality, it simply offers the same textbooks and course materials that were offered before, but in a restricted electronic-only format, and with time-limited access.

58.     In addition to being more expensive, Inclusive Access also does not allow students who learn better from a print format to use print. Students also cannot keep the materials for future reference, to help them in future classes and in their careers.

59.     Inclusive Access can require professors to spend class time explaining how to use the system, and students can be cut off from the materials when there are technical problems or when they don't have Internet access, both problems that don't exist with standard textbooks.

60.     A study by the Tennessee Board of Regents comparing student performance before and after the use of Inclusive Access found that the percentage of students who obtained a grade of at least "C" actually declined in a majority of courses after switching to Inclusive Access.

61.     The Publisher Defendants have also justified Inclusive Access by claiming that the cost to students is lower. However, while the cost may in some cases be lower than the list price of new versions of the Inclusive Access textbooks (which is set by the Publisher Defendants and can be artificially inflated to make it appear that Inclusive Access is a bargain), it is far higher than the price that would exist in the event of open competition from used books, off-campus retailers, and online retailers and sellers.

62.     Several examples follow:

    a.     At UCLA, the Inclusive Access price of N. Gregory Mankiw's *Principles of Economics* is allegedly $108.98. The same textbook can allegedly be rented for $34.51 on

Amazon or Chegg. Mankiw is estimated to have made $42 million in royalties from his textbook, illustrating the profitability of a best-selling textbook title such as many of those in the Inclusive Access system.

      b.    At Ohio State University, for the course CHEM 1250 General Chemistry for Engineers, students were required to purchase Chemistry, The Central Science (14th Edition), Brown et al. (ISBN 978-0134414232). The Inclusive Access list price was $98.00 and price at which students could purchase the book through Inclusive Access was $41.62. Had students been able to shop for a hard copy of the textbook outside of Inclusive Access, the price was lower: $24.99 for a used copy and $14.99 to rent a copy.

      c.    Likewise, at Ohio State, for the course BUSFIN 3300 Introduction to Insurance and Risk, students were required to purchase Principles of Risk Management and Insurance (ISBN 978-0134082578). The Inclusive Access list price was $79.99 and price at which students could purchase the book through Inclusive Access was $53.99. Had students been able to shop for a hard copy of the textbook outside of Inclusive Access, the price was lower: $47.61 for a used copy and $14.00 for a .pdf.

63.    Moreover, in a recent survey of book and supply costs at universities for the period 1999-2018, the overall cost has risen at Duquesne University where Plaintiff Elizabeth Kinskey attends. Duquesne reported average costs of $1,000 from 2008-14, but those costs have risen to $1,400 for the most recent period.

64.    The Publisher Defendants' executives have stated their intention to eliminate the used book market. Cengage CEO Michael Hansen agreed in an interview that his goal is to rid the industry of the used textbook market. McGraw-Hill CEO Nana Banerjee stated: "[a]nd there is a half-life that is associated with kind of taking out this used secondary market book enterprise

15

that really has been a disruptor for us."

## V.     RELEVANT MARKET

65.     Plaintiffs allege that Defendants' conduct was *per se* illegal: the Publisher Defendants and Retailer Defendants colluded to establish and operate the Inclusive Access system in order to restrict the supply of textbooks and monopolize the market for textbooks so that they could raise prices.

66.     However, to the extent that Plaintiffs' claims must proceed under the rule of reason or otherwise require the definition of a relevant market, Plaintiffs alternatively allege as follow.

67.     The relevant product market for the purposes of the antitrust claims in this action is the market for higher education textbooks and course materials for courses subject to Inclusive Access (the "Inclusive Access Market").

68.     The Inclusive Access conspiracy by Defendants seeks to use Inclusive Access to eliminate competition from new textbooks, used textbooks, and other electronic versions of textbooks, and from other online and physical textbook sellers.

69.     The Inclusive Access Market is a product market consisting only of Inclusive Access textbooks. There are no substitutes for an Inclusive Access textbook. The availability of new or used textbooks does not constrain the price of Inclusive Access textbooks, because students are not allowed to use those textbooks in place of the Inclusive Access textbooks.

70.     Inclusive Access textbooks can only be purchased from official on-campus retailers, whether run by the Retailer Defendants or by a college itself. Inclusive Access textbooks are generally not available from any other source, or in the rare instances when they are, they are more expensive. Therefore, the isolated availability of Inclusive Access textbooks from other sources does not constrain their price from official on-campus retailers.

71.     At all relevant times, the Publisher Defendants had substantial market power in the Inclusive Access Market. On information and belief, the Publisher Defendants have a market share of over 90% in the Inclusive Access Market.

72.     The Publisher Defendants had the power to maintain the price of Inclusive Access materials at supracompetitive levels, and to do so profitably without losing substantial sales.

73.     The relevant geographic market is the United States.

74.     At all relevant times, the Retailer Defendants had substantial market power in the Inclusive Access Market at all colleges in which they operate official on-campus bookstores that have Inclusive Access programs. The Retailer Defendants had the power to maintain the price of Inclusive Access materials on those campuses at supracompetitive levels, and to do so profitably without losing substantial sales.

75.     The Retailer Defendants have over a 50% market share in the percentage of official on-campus bookstores that they operate, and they serve nearly two-thirds of the nation's college and graduate students, and therefore have a very high market share in the overall Inclusive Access Market.

76.     The Inclusive Access Market is susceptible to collusion due to a small number of dominant publishers, the monopoly position of on-campus bookstores, the captive market of students who need the Inclusive Access textbooks to pass their classes, and high barriers to entry due to Publisher Defendants' and Retailer Defendants' longstanding relationships with textbook authors, professors assigning textbooks, and universities.

77.     If the Defendants' actions are not enjoined, the Inclusive Access Market is likely to take over more and more college textbook and course materials sales, resulting in higher prices and reduced choice for more students on more campuses and in more of their courses.

## VI.    ANTITRUST INJURY

78.    At colleges that use Inclusive Access whose bookstores are run by the Retailer Defendants, the Publisher Defendants and Retailer Defendants' actions have forced Plaintiffs and Class members to purchase Inclusive Access textbooks from only the Retailer Defendants, causing them to pay higher prices than if the textbooks were available in multiple formats and from different sources, including the secondary market.

79.    At colleges that use Inclusive Access whose bookstores are college-run, the Publisher Defendants' actions have forced Class members to purchase Inclusive Access textbooks from only their official college-run bookstore, causing them to pay higher prices than if the textbooks were available in multiple formats and from different sources, including the secondary market.

80.    Without Inclusive Access, Plaintiffs and other Class members would have many options to purchase textbooks, including new and used versions of print textbooks and electronic versions of textbooks, and purchasing from on-campus bookstores, off-campus bookstores, and online sources, including the secondary market, and competition between those options would result in lower prices.

81.    Defendants' actions have injured Plaintiffs and other Class members and they have suffered antitrust injury as a result.

## VII.    INTERSTATE COMMERCE

82.    Defendants' actions have had a significant effect on interstate commerce in the market for college textbooks.

83.    B&N has on-campus college bookstores in 43 states. On information and belief, B&N sells Inclusive Access to students in all 43 of those states.

84.    Follett has on-campus college bookstores in 48 states. On information and belief,

Follett sells Inclusive Access to students in all 48 of those states.

85.     Cengage, McGraw, and Pearson sell textbooks and course materials through Inclusive Access to students in all 50 states.

86.     The conspiracy herein had a substantial effect on the national market for college textbooks, including the national market for college textbooks subject to Inclusive Access programs.

## VIII.     FRAUDULENT CONCEALMENT

87.     The Defendants concealed their conspiracy from Plaintiffs and other members of the Class. The Defendants' actions in developing and implementing the Inclusive Access conspiracy occurred in private communications, including through trade associations that claimed publicly to have other purposes. The Defendants' public statements promoted Inclusive Access to students and universities as being a technological advance, being cheaper, or being a response to consumer demand, not as a conspiracy to raise prices and increase profits by eliminating competition.

88.     Plaintiffs and other members of the Class did not have access to information that would have alerted them to the possibility of the conspiracy between the Publisher Defendants and Retailer Defendants. A college student instructed that the textbook for a certain course would only be available through Inclusive Access would not reasonably suspect that it was the result of a conspiracy to increase profits by eliminating competition at the students' expense.

89.     In light of the above, the Publisher Defendants and Retailer Defendants' knowing and active efforts to conceal the conspiracy and the conduct behind it should be deemed to toll any statute of limitations herein, and to estop Defendants from using any statute of limitations defense in this action.

## IX.     CLASS ALLEGATIONS

90.     Plaintiffs bring this action on behalf of themselves and all others similarly situated

pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) as representatives of a Class

defined as follows:

> All students at colleges or graduate schools in the United States
> and its territories who were required to purchase textbooks or
> course materials through Inclusive Access.

Excluded from the Class are Defendants and their employees.

91.     Plaintiffs satisfy Fed. R. Civ. P. 23(a)(1). The members of the Class are so

numerous that joinder is impracticable. There are at least hundreds of thousands if not millions of

college students who were required to purchase textbooks and other course materials from the

Defendants under Inclusive Access plans.

92.     Plaintiffs satisfy Rule 23(a)(2) and (b)(3).  There are numerous questions of law

and fact that are common to the Class and that predominate over any issues affecting individual

members of the Class, including, *inter alia*:

>     a.   Whether the Publisher Defendants and Retailer Defendants agreed to create,
>          promote, implement and enforce the Inclusive Access system;
>
>     b.   Whether the Publisher Defendants agreed with college-run campus bookstores
>          to create, promote, implement and enforce the Inclusive Access system on
>          those campuses;
>
>     c.   Whether the Publisher Defendants agreed among themselves to fix and raise
>          the price of textbooks and course materials under the Inclusive Access system;
>
>     d.   Whether the Publisher Defendants refused to deal with independent retailers
>          who sought to sell Inclusive Access materials;
>
>     e.   Whether those agreements violated the federal antitrust laws;
>
>     f.   The time period, number of universities, and number of students affected by

the Inclusive Access system;

g. Whether the Publisher Defendants had market power in the market for college textbooks and course materials subject to Inclusive Access;

h. Whether the Publisher Defendants substantially foreclosed competition in the market for college textbooks and course materials subject to Inclusive Access;

i. Whether the Retailer Defendants had monopoly power in the market for college textbooks and course materials subject to Inclusive Access on the campuses in which they operate official on-campus bookstores;

j. Whether Inclusive Access has a legitimate pro-competitive justification;

k. Whether the conduct alleged herein has artificially maintained, preserved, or enhanced the Publisher Defendants' market power in the market for college textbooks and course materials subject to Inclusive Access;

l. Whether the conduct alleged herein has artificially maintained, preserved, or enhanced the Retailer Defendants' monopoly power in the market for college textbooks and course materials subject to Inclusive Access on the campuses in which they operate official on-campus bookstores;

m. Whether the actions of the Publisher Defendants as described herein were a violation of the Sherman Act;

n. Whether the actions of the Retailer Defendants as described herein were a violation of the Sherman Act;

o. Whether Plaintiffs and the Class suffered injury as a result of the Defendants' actions, and if so, the extent of those damages; and

p. The appropriate injunctive and equitable relief for the Class.

93. Plaintiffs satisfy Rule 23(a)(3). Plaintiffs' interests are typical of, and not

antagonistic to, those of other or absent members of the Class, such that they can fairly and adequately represent and protect their interests.

94.     Plaintiffs and their counsel satisfy Rule 23(a)(4). Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions.

95.     Plaintiffs satisfy Rule 23(b)(1).  If individual Class members prosecuted many separate actions, there would be a risk that the outcomes of those actions would be inconsistent with one another.

96.     Class certification is also appropriate under Rule 23(b)(2) because Defendants have acted and refused to act on grounds generally applicable to the Classes as a whole, such that final injunctive relief is appropriate with respect to the Classes as a whole.  Such injunctive relief includes, but is not limited to, the implementation of systemic changes to prevent such conduct in the future as mentioned above.

97.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The purpose of a class action is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation.  Individual litigation by each class member would also strain the court system, create the potential for inconsistent or contradictory judgments, and increase the delay and expense to all parties and the court system.  By contrast, the class action presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

## X.     CAUSES OF ACTION

### COUNT ONE
### UNLAWFUL AGREEMENT TO RESTRAIN TRADE (15 U.S.C. § 1)

98.     Plaintiffs repeat and reallege each of the allegations contained in the paragraphs

above as if fully set forth herein.

99. The Publisher Defendants agreed to restrain trade in textbooks through the Inclusive Access conspiracy described herein: (1) working with the Retailer Defendants and college-run bookstores to impose Inclusive Access, (2) arranging to have universities mandate the purchase of Inclusive Access textbooks by students, (3) arranging to have universities prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (4) refusing to sell Inclusive Access textbooks to retailers other than official on-campus bookstores, whether run by the Retailer Defendants or by colleges themselves, including by imposing pretextual anti-counterfeiting standards, all with the intention of eliminating competition and raising prices by establishing a captive market for textbooks through Inclusive Access.

100. The Retailer Defendants agreed to restrain trade in textbooks on the universities on which they operate official on-campus bookstores through the Inclusive Access conspiracy described herein: (1) working with the Publisher Defendants and universities to impose Inclusive Access, (2) arranging to have universities mandate the purchase of Inclusive Access textbooks by students, and (3) arranging to have universities prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, all with the intention of eliminating competition and raising prices by establishing a captive market for textbooks through Inclusive Access.

101. As a result of the Publisher Defendants and Retailer Defendants' Inclusive Access agreements as described herein, Plaintiffs and other Class members had to pay higher prices for textbooks as a result of the elimination of competition, and it has therefore caused them injury.

102. Plaintiffs and the Class also seek an injunction against Defendants, preventing and

restraining the violations alleged above, under § 16 of the Clayton Act.

**COUNT TWO**
**MONOPOLIZATION (15 U.S.C. §2)**

103.     Plaintiffs repeat and reallege each of the allegations contained in the paragraphs above as if fully set forth herein.

104.     In the market for Inclusive Access textbooks at each individual university that uses Inclusive Access, the Publisher Defendants (and the Retailer Defendants at universities where they run the official on-campus bookstore) have monopoly power, and acquired that power willfully through the conspiracy described herein rather than through any technological advantages from, or consumer demand for, Inclusive Access.

105.     In the market for Inclusive Access textbooks at each individual university that uses Inclusive Access, at universities at which a Retailer Defendant runs the official on-campus bookstore, the Publisher Defendants and Retailer Defendants acquired their monopoly power through anticompetitive and exclusionary means: (1) arranging to have the university mandate that students purchase Inclusive Access textbooks and purchase them only from the Retailer Defendant who runs the official on-campus bookstore, (2) arranging to have the university prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (3) the Publisher Defendants refusing to sell Inclusive Access textbooks to retailers other than the official on-campus bookstore run by the Retailer Defendant, including by imposing pretextual anti-counterfeiting standards.

106.     In the market for Inclusive Access textbooks at each individual university that uses Inclusive Access, at universities where the university runs the official on-campus bookstore, the Publisher Defendants acquired their monopoly power through anticompetitive and exclusionary means: (1) arranging to have the university mandate that students purchase

Inclusive Access textbooks and purchase them only from the official on-campus bookstore, (2) arranging to have the university prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (3) refusing to sell Inclusive Access textbooks to retailers other than the official on-campus bookstore, including by imposing pretextual anti-counterfeiting standards.

107.    These actions by the Publisher Defendants and Retailer Defendants have served to create and maintain their monopoly for Inclusive Access textbooks at each such university, in violation of 15 U.S.C. §2.

108.    The Publisher Defendants and Retailer Defendants' violation of 15 U.S.C. §2 has caused injury to Plaintiffs and other Class members by forcing them to pay higher prices for textbooks than they would pay in a competitive market for textbooks in the absence of Defendants' anticompetitive Inclusive Access practices.

109.    Plaintiffs and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## COUNT THREE
## ATTEMPTED MONOPOLIZATION (15 U.S.C. §2)

110.    Plaintiffs repeat and reallege each of the allegations contained in the paragraphs above as if fully set forth herein.

111.    In the market for Inclusive Access textbooks at each individual university that uses Inclusive Access, the Publisher Defendants (and the Retailer Defendants at universities where they run the official on-campus bookstore) engaged in predatory and anticompetitive conduct with the specific intent of monopolizing that market, and with a dangerous probability of monopolizing that market.

112.    In the market for Inclusive Access textbooks at each individual university that

uses Inclusive Access, at universities at which a Retailer Defendant runs the official on-campus bookstore, the Publisher Defendants and Retailer Defendants engaged in the following anticompetitive and exclusionary conduct with the specific intent of monopolizing the market: (1) arranging to have the university mandate that students purchase Inclusive Access textbooks and purchase them only from the Retailer Defendant who runs the official on-campus bookstore, (2) arranging to have the university prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (3) the Publisher Defendants refusing to sell Inclusive Access textbooks to retailers other than the official on-campus bookstore run by the Retailer Defendant, including by imposing pretextual anti-counterfeiting standards.

113.    In the market for Inclusive Access textbooks at each individual university that uses Inclusive Access and at universities where the university runs the official on-campus bookstore, the Publisher Defendants engaged in the following anticompetitive and exclusionary conduct with the specific intent of monopolizing the market: (1) arranging to have the university mandate that students purchase Inclusive Access textbooks and purchase them only from the official on-campus bookstore, (2) arranging to have the university prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (3) refusing to sell Inclusive Access textbooks to retailers other than the official on-campus bookstore, including by imposing pretextual anti-counterfeiting standards.

114.    There is a dangerous probability that the Publisher Defendants' conduct will in fact monopolize the market for Inclusive Access textbooks at universities that use Inclusive Access, and that the Retailer Defendants' conduct will in fact monopolize the market for Inclusive Access textbooks at the universities at which they operate the official on-campus bookstores, since through these policies they have excluded all other possible competition from

that market.

115. These actions by the Publisher Defendants (and Retailer Defendants where applicable) are attempted monopolization of the market for Inclusive Access textbooks at each such university, in violation of 15 U.S.C. §2.

116. The Publisher Defendants and Retailer Defendants' violation of 15 U.S.C. §2 has caused injury to Plaintiffs and other Class members by forcing them to pay higher prices for textbooks than they would pay in a competitive market for textbooks in the absence of Defendants' anticompetitive Inclusive Access practices.

117. Plaintiffs and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

**COUNT FOUR**
**CONSPIRACY TO MONOPOLIZE (15 U.S.C. §2)**

118. Plaintiffs repeat and reallege each of the allegations contained in the paragraphs above as if fully set forth herein.

119. The Publisher Defendants colluded to restrain trade in textbooks through the Inclusive Access conspiracy described herein, with the specific intent to monopolize the market for Inclusive Access textbooks: (1) working with the Retailer Defendants and college-run bookstores to impose Inclusive Access, (2) arranging to have universities mandate the purchase of Inclusive Access textbooks by students, (3) arranging to have universities prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (4) refusing to sell Inclusive Access textbooks to retailers other than official on-campus bookstores, whether run by the Retailer Defendants or by colleges themselves, including by imposing pretextual anti-counterfeiting standards, all with the intention of eliminating competition and raising prices by establishing a captive market for textbooks through Inclusive Access.

120.     The Retailer Defendants colluded to restrain trade in textbooks on the universities on which they operate official on-campus bookstores through the Inclusive Access conspiracy described herein, with the specific intent to monopolize the market for Inclusive Access textbooks on those universities: (1) working with the Publisher Defendants and universities to impose Inclusive Access, (2) arranging to have universities mandate the purchase of Inclusive Access textbooks by students, and (3) arranging to have universities prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, all with the intention of eliminating competition and raising prices by establishing a captive market for textbooks through Inclusive Access.

121.     The Publisher Defendants and Retailer Defendants committed overt acts in furtherance of the conspiracy alleged herein, including entering into exclusivity agreements between Publisher Defendants, Retailer Defendants, and universities, between Publisher Defendants and Retailer Defendants, and between Publisher Defendants and universities.

122.     These actions by the Publisher Defendants (and Retailer Defendants where applicable) are a conspiracy to monopolize the market for Inclusive Access textbooks at each such university, in violation of 15 U.S.C. §2.

123.     The Publisher Defendants and Retailer Defendants' conspiracy to monopolize the market for Inclusive Access textbooks at each such university in violation of 15 U.S.C. §2 has caused injury to Plaintiffs and other Class members by forcing them to pay higher prices for textbooks than they would pay in a competitive market for textbooks in the absence of Defendants' anticompetitive Inclusive Access practices.

124.     Plaintiffs and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## XI.    CONCLUSION

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

a)  Certify the Class, appoint Plaintiffs as class representatives and their counsel as Class Counsel;

b)  Enter judgment against Defendants for violations of 15 U.S.C. § 1 and 2;

c)  Award, pursuant to 15 U.S.C. § 15, compensatory and trebled damages to the Class resulting from Defendants' violations of the Sherman Act;

d)  Order, pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing Defendants from continuing their unlawful acts in violation of the Sherman Act;

e)  Award Plaintiffs and the Class their costs, expenses, and reasonable attorney's fees in bringing this action;

f)  Award pre-judgment and post-judgment interest on all sums awarded; and

g)  Grant such other and further relief as this Court deems appropriate.


Dated: April 15, 2020                              FEGAN SCOTT LLC


By: *Elizabeth A. Fegan*
Elizabeth A. Fegan
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Ph: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

Lynn A. Ellenberger
FEGAN SCOTT, LLC
500 Grant St., Suite 2900
Pittsburgh, PA 15219
Ph: 412.346.4104
Fax: 412.785.2400
lynn@feganscott.com

J. Barton Goplerud
SHINDLER, ANDERSON,
GOPLERUD & WEESE, P.C.
5015 GRAND RIDGE DRIVE,
SUITE 100
WEST DES MOINES, IA 50265
Ph: (515) 223-4567
Fax: (515) 223-8887
goplerud@sagwlaw.com

*Counsel for Plaintiffs*

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues properly triable to a jury in this case.

Dated: April 15, 2020

By: /s/ *Elizabeth A. Fegan*
Elizabeth A. Fegan
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Ph: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com
Counsel for Plaintiffs

31